**NOT DESIGNATED FOR PUBLICATION**

**STATE OF LOUISIANA**

**COURT OF APPEAL**

**FIRST CIRCUIT**

**2023 CU 1033**

LINDSEY FAITH RICHARD

VERSUS

WILLIAM OSCAR CLARKE, II

Judgment Rendered: **FEB 2 1 2024**

\* \* \* \* \* \*

On Appeal from the Twenty-First Judicial District Court
In and for the Parish of Livingston
State of Louisiana
Docket No. 169091

Honorable Jeffery T. Oglesbee, Judge Presiding

\* \* \* \* \* \*

Sherman Q. Mack
C. Glenn Westmoreland
Albany, Louisiana

Counsel for Plaintiff/Appellee
Lindsey Faith Richard


Jenel Guidry Secrease
Ponchatoula, Louisiana

Counsel for Defendant/Appellant
William Oscar Clarke, II

\* \* \* \* \* \*

**BEFORE:  McCLENDON, HESTER, AND MILLER, JJ.**

**McCLENDON, J.**

In this child custody dispute, the father appeals a trial court judgment modifying the previous consent judgment establishing physical custody of the minor child. For the reasons that follow, we reverse in part and affirm in part.

## FACTS AND PROCEDURAL HISTORY

Lindsey Faith Richard, appellee, and William Oscar Clarke, II, appellant, are the parents of A.C., born January 13, 2019. Ms. Richard filed a "Petition for Custody, to Set Child Support[,] and for Partition of Jointly Owned Property" on January 7, 2021. Thereafter, the parties entered into a consent judgment, which the trial court signed on July 14, 2021 (the July 14, 2021 consent judgment). The July 14, 2021 consent judgment provided that the parties would generally share physical custody of A.C. on an alternating weekly basis and exchange custody at 6:00 p.m. on Fridays. The July 14, 2021 consent judgment also provided an alternate physical custody schedule for periods when Mr. Clarke was working out of town, pursuant to which he would enjoy physical custody every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m. The July 14, 2021 consent judgment further designated Ms. Richard as the domiciliary parent, set forth the holiday custody schedule, established co-parenting guidelines, and directed that Mr. Clarke pay Ms. Richard $1,200.00 per month in child support.

On April 25, 2022, Mr. Clarke filed a "Motion to Decrease Support" seeking modification of the child support order on the basis that his income had decreased. On June 1, 2022, Ms. Richard filed a "Rule for Contempt, [to] Make Arrears Executory, and [to] Modify Custody and Child Support."[1] On October 3, 2022, the parties stipulated that they would continue to follow the July 14, 2021 consent judgment, subject to certain modifications. A written judgment consistent therewith was signed by the trial court on November 2, 2022 (the November 2, 2022 consent judgment). The November 2, 2022 consent judgment provided, in pertinent part, that the parties "shall each offer the minor

---

[1] Ms. Richard alleged that Mr. Clarke failed to make the required child support payments and was in arrears in excess of thirteen thousand dollars. Thus, Ms. Richard sought an order making Mr. Clarke's child support arrears executory, scheduling payment of the arrears, finding Mr. Clarke in contempt of court, and sanctioning Mr. Clarke accordingly. Ms. Richard also sought an order directing Mr. Clarke to produce proof of his income for recalculation of child support. Ms. Richard further requested additional co-parenting guidelines and modification of Mr. Clarke's physical custody periods from alternating weeks to alternating weekends.

2

child to the other party for any overnight period that they cannot be present or need a caretaker for an overnight period" (the right of first refusal); that Mr. Clarke's child support obligation was reduced from $1,200.00 to $800.00 per month, based on the parties' gross incomes; that Mr. Clarke's arrears through September 30, 2022 amounted to $10,000.00, to be paid in a lump sum "when he receives inheritance money from the sale of family land" (inheritance); and that, until Mr. Clarke received the inheritance, he would pay $50.00 per month toward the arrears. The November 2, 2022 consent judgment further provided that the parties "shall exchange the child the [second] week of August each year so that [Ms. Richard] has the child the [second] week." In other respects, the parties would continue to follow the July 14, 2021 consent judgment.

On February 17, 2023, Mr. Clarke filed a "Rule for Contempt" alleging that Ms. Richard had refused to allow his weekend visitation since January 29, 2023, based on him working out of town. Mr. Clarke further alleged that Ms. Richard was "threatening to not allow him to have his Mardi Gras visitation." Thus, Mr. Clarke requested that Ms. Richard be found in contempt and cast with all court costs and attorney's fees.

On March 7, 2023, Ms. Richard filed a "Second Rule for Contempt[,] for Non Payment of Child Support[,] and Arrears[.]" Ms. Richard alleged Mr. Clarke paid $400.00 in child support since November of 2022, but he failed to pay the $10,000.00 arrearage despite receiving the inheritance. Thus, Ms. Richard requested an assignment of wages; that any and all amounts defined as arrearages be made executory; that Mr. Clarke be held in contempt and sanctioned; and that Mr. Clarke be cast with all court costs and attorney's fees.

Pertinent to this appeal, Ms. Richard's second rule for contempt also alleged that a change in circumstances warranted modification of the physical custody schedule set forth in the July 14, 2021 and November 2, 2022 consent judgments (sometimes collectively, "the consent judgments"). Specifically, Ms. Richard argued that A.C. was not of school age when the prior judgment was entered, and that because A.C. would be attending school in August of 2023, she needed a more routine schedule. Ms. Richard also contended that while the consent judgments anticipated that Mr. Clarke would only work out of town occasionally, he had been working out of town "a majority of the time[.]"

3

Both parties' rules were set for trial on April 27, 2023. After hearing testimony from both parties, the trial court found both parties in contempt, and consequently, did not award attorney's fees and court costs. Regarding child support, the trial court found Mr. Clarke owed Ms. Richard $2,400.00 in addition to the prior arrearages, and made same executory. With respect to the physical custody periods Ms. Richard denied Mr. Clarke, the trial court awarded Mr. Clarke makeup time for the physical custody periods he missed. The trial court further granted Ms. Richard's rule to modify custody and awarded Mr. Clarke physical custody of A.C. the first, third, and fourth weekends of each month, from Thursday at 5:00 p.m. until Sunday at 5:00 p.m., and the first and third weeks of June and July from Sunday at 5:00 p.m. until the following Sunday at 5:00 p.m. The trial court stated, in pertinent part:

> In support of her request to modify custody, Ms. Richard has specified to the fact that the minor child, [A.C.], will be starting pre-k 4. Although I didn't hear exactly which school, presumably its in East Baton Rouge Parish where she currently resides. Mr. Clarke resides here in Livingston Parish. Her concern is that upon [A.C.] starting formal schooling that it would be in her best interest to have a more routine and stable schedule and she has concerns about Mr. Clarke being able to get the minor child to school.
>
> Mr. Clarke has testified that he would rely on some assistance from his fiancée or his soon-to-be mother-in-law to help with the transportation due to his work schedule. Currently he works Monday through Thursday, ten hours a day, with the occasional overtime or turnaround schedule, depending on the needs that come up. Both parties have other minor children in their household. Ms. Richard has two minor, minor (sic) children who are currently babies, and Mr. Clarke has an older child who is eleven years old who attends school in Livingston Parish.
>
> Mr. Clarke, sir, I do have some concerns about how you would be able to accomplish getting two different children to two different schools during your custodial time. If they were going to the same school or the schools were located close to each other that would alleviate some of my concerns. But I do have some sincere concerns about that going forward beginning in the fall. However, I do acknowledge that you've been doing a shared custody schedule. You both testified that it's been working well. The concern is when school starts.
>
> I - - I don't want to deprive you of your custodial time, but I do have to acknowledge that I think it would be a concern of mine when school starts that it would not necessarily be in the best interest of [A.C.] to maintain the week-to-week custodial schedule.
>
> Therefore after carefully considering the factors contained in civil article 134 (sic), particularly factor ten, the home, school, community history of the minor child; factor 13, the distance between the respective residences of the parties; and then factor 14 the responsibility care and rearing of the child previously exercised by each part, the court finds that it would be in the best interest of the minor child that the custodial schedule

4

be modified, effective August the 1st, 2023, maintaining joint custody, with Ms. Richard as domiciliary parent. During the months of August through May, the school - - which would cover the school year - - the school months - - Mr. Clarke will enjoy custodial time the first, third, and fourth weekends of the month from Thursday at 5:00 until Sunday at 5:00. Basically, sir, although I'm reducing some of your days, I'm maintaining almost all of your days with the minor child and these are the days that you're actually off from work. Ms. Richard, Mr. Clarke's testified that he's off on Fridays so that will alleviate my concerns about him getting the minor child to and from school on those Friday[s]. During the summer months of June and July the parties will - - Mr. Clarke will have the first and third weeks of the months from the first and third Sunday of the month at 5:00 until the following Sunday at 5:00. The parties are to equally share the major school holidays of Christmas, Thanksgiving, Easter, and Mardi Gras / spring break, with those being equally shared between the parties with the halves rotating on an annual basis.

The trial court signed a written judgment in conformity with its oral reasons on May 24, 2023. Mr. Clarke has appealed.

## ASSIGNMENTS OF ERROR

On appeal, Mr. Clarke argues that the trial court erred in modifying the physical custody schedule because Ms. Richard failed to prove a change in circumstances materially affecting A.C.'s welfare. Mr. Clarke maintains the only change in circumstances Ms. Richard established was that A.C. would soon be beginning pre-k 4, and that Ms. Richard failed to establish how or why that change materially affected A.C.'s welfare. Specifically, Mr. Clarke asserts that Ms. Richard's request for modification of custody was based solely on her speculative concerns that he would not be able to timely transport A.C. to and from a new school, and she failed to substantiate those concerns in any way. Mr. Clarke also argues that the trial court erred in modifying the physical custody schedule because the evidence established that the previous physical custody schedule was both feasible and in A.C.'s best interest.

## BURDEN OF PROOF: MODIFICATION OF CUSTODY

When a custody decree is, as herein, a stipulated or consensual judgment, a party seeking modification of custody must prove that there has been a material change in circumstances, also referred to as a change in circumstances materially affecting the welfare of the child, since the original decree, as well as prove that the proposed modification is in the best interest of the child. **Fin v. Fin**, 2019-0566 (La.App. 1 Cir. 9/27/19), 288 So.3d 142, 144. As pointed out by Justice Weimer (then Judge Weimer) in

5

a concurrence in **Shaffer v. Shaffer**, 2000-1251 (La.App. 1 Cir. 9/13/00), 808 So.2d 354, writ denied, 2000-2838 (La. 11/13/00), 774 So.2d 151, which this court favorably cited in **Fin**, 288 So.3d at 144 and in **Tinsley v. Tinsley**, 2016-0891 (La.App. 1 Cir. 1/18/17), 211 So.3d 405, 413, in determining whether there is a material change in circumstances, "[i]t is the child upon whom we must focus. Life changes may occur, but if the changes do not have an effect on the welfare of the child, then no change in custody is justified." **Shaffer**, 808 So.2d at 360 (Weimer J., concurring).

## DISCUSSION

The record before us reflects that Ms. Richard testified Mr. Clarke and A.C. "have a very good relationship[,]" and Mr. Clarke testified Ms. Richard was "[a]bsolutely" a good mother. The parties' testimony further established that A.C. has her own room and a similar household routine in both homes, as both parents stated she would typically bathe and eat before going to bed around 8:30 p.m. The record also reflects that A.C. has positive relationships with her siblings in both of her parents' homes: Mr. Clarke testified that he had physical custody of his older daughter, then eleven years old, on the same week-to-week schedule as A.C., and Ms. Richard testified that she had two other children, a fifteen-month-old and a three-month-old. Ms. Richard testified:

> [A.C. is] very involved with both of our families. She has siblings . . . in both families, younger and older. So she likes to play with them a lot. She spends a lot of time with them. We like to include everyone. There are times when we have done stuff together, both of our families, in order to include all the children.

Moreover, Ms. Richard described the parties as "great communicators."[2] When asked whether she had any issues with the current custody schedule, Ms. Richard answered, "Not majorly. There have been times where we've, or he's given up sometime (sic) to do things, but I've also done the same. So we just give each other first right of refusal for both."

According to Ms. Richard, the parties' homes are about thirty to thirty-five minutes apart. Ms. Richard lives with her mother. Ms. Richard testified that she usually works 9:30

---

[2] We note that Ms. Richard complained of "communication issues" with Mr. Clarke's fiancée during her trial testimony. She testified, "For one, I am blocked on social media and I also am not able to communicate in person or in text message. I just don't get a response." However, Mr. Clarke recalled Ms. Richard bringing this alleged issue to his attention "once[.]"

6

a.m. to 5:00 p.m., Monday, Wednesday, and Friday, as the office manager at Dynamic Power Sports. She takes A.C. to and from daycare five days a week. Ms. Richard testified that when A.C. started school, she would be able to pick A.C. up from school and bring her back to her workplace, and, "If not, I do have my mother who can watch her, or we can still keep her in daycare if that would be better for everyone. That is an option. One of the schools does drop off and pick up from the daycare."

Regarding Mr. Clarke working out of town in the past, Ms. Richard initially testified that he did so "Every now and then. Not often." She testified that over the past six months, Mr. Clarke had been out of town working, "Like a month or maybe six weeks." Ms. Richard's testimony on cross-examination clarified that Mr. Clarke was actually only out of town about six weeks out of the past eighteen months to two years. Ms. Richard also acknowledged that because the consent judgments anticipated that Mr. Clarke would work out of town on occasion and provided that he would have physical custody every other weekend under those circumstances, Ms. Richard would be able to take A.C. to and from school in those instances. Mr. Clarke testified that he had only worked out of town twice since the beginning of this case, when the parties "first went to court in April of '21 and then this past job in Texas."[3] Both instances lasted about six weeks.

Mr. Clarke testified that his current position as a welder in Geismar, Louisiana, would "very rarely" involve travel and that he took the position "to be home." His schedule at the time of trial was "four tens, working 6:00 AM to 4:30 PM[,]" Monday through Thursday. Mr. Clarke acknowledged that he would probably not be able to take A.C. to school himself because of his work schedule, but testified that his fiancée and her mother would be able to take A.C. to and from school. Mr. Clarke further testified that he had shared custody of his older daughter since she was about A.C.'s age, and he had not had any problems getting her to school on time. Mr. Clarke admitted he had kept A.C. home from daycare on occasion so she could spend time with him or her sister, but testified he would not do that if she was enrolled in regular school. Mr. Clarke also testified he would

---

[3] Mr. Clarke testified that when he works turnarounds, he would normally work seven days a week, for ten to twelve hours. The turnaround he worked during the time period Ms. Richard denied his visitation was for five or six weeks, and he worked seven twelve-hour days. He was initially staying with a friend, but rented a cabin to have space for his children to come visit.

be able to take A.C. to the doctor and help her with homework. Mr. Clarke did not recall Ms. Richard bringing up any issues with him about A.C.'s attendance at daycare. When asked, "What assurances can you give to [Ms. Richard] and the court that [A.C.] would continue to have stability in your home for school?" Mr. Clarke replied, "I don't know how to give assurances on that, but I haven't - - I haven't not done it since I've had her. So I don't feel there should be a reason that she doesn't believe it."

At the time of trial, A.C. was doing very well in a "pre-k 3" program at her daycare. Regarding Ms. Richard's request to modify custody, Ms. Richard explained, "I'd like to modify it due to her starting school in August and do (sic) pre-k 4. And my concerns are how she would get to and from school due to [Mr. Clarke's] work schedule." When questioned further, Ms. Richard continued to repeat this sentiment, stating that her "top concern" was A.C. "getting to and from school in a timely manner." However, Ms. Richard did not testify to any factual event or occurrence that substantiated her concerns. To the contrary, when asked whether Mr. Clarke currently managed to get A.C. to and from daycare every day during his custody periods, Ms. Richard conceded that he did, though she qualified that he did so "with assistance" from his fiancée or his fiancée's mother. Moreover, when Ms. Richard was asked if she had a problem with Mr. Clarke's fiancée or her mother helping Mr. Clarke with A.C., she responded, "No, I don't have a problem with that at all." Ms. Richard also admitted that the grounds for her concerns were speculative: when asked, "So you want to modify custody because you're speculating that maybe he won't be able to get her to school?" Ms. Richard responded, "Yes."

When asked what schedule she believed would be in A.C.'s best interest during the school term, Ms. Richard responded, "I feel her going every other weekend to his house and maybe even a night during the week would be beneficial to her." Ms. Richard testified that during the summer, she would like a shared week-to-week schedule. When asked whether the proposed modification in the custody schedule would impact Mr. Clarke's relationship with A.C., Ms. Richard testified, "I don't feel it would impact their relationship. I feel it would impact the time spent together." Ms. Richard admitted that altering the custody schedule would limit the time A.C. spent with her other siblings.

8

As set forth above, in this matter, as the party seeking a modification of custody, Ms. Richard was required to prove that there has been a material change in circumstances affecting the welfare of the child since the previous decree, as well as prove that the proposed modification is in the best interest of the child. See **Fin**, 288 So.3d at 144. Having thoroughly reviewed the record before us and considering the applicable law, we find that Ms. Richard failed to meet her burden of proof, and the trial court erred in modifying the custody schedule.

We begin by pointing out that Ms. Richard's March 7, 2023 request to modify custody was filed approximately four months after the parties executed the November 2, 2022 consent judgment. Further, her request was based on speculative concerns that A.C.'s commencement of pre-k could potentially result in Mr. Clarke failing to transport A.C. to and from school in a timely manner. However, the only actual change Ms. Richard established was that A.C. would soon be beginning pre-k 4. Ms. Richard did not offer any evidence of the name or location of the school, or that Mr. Clarke would be unable to transport A.C. to and from school in a timely manner. Additionally, there was no evidence that timely transportation to and from daycare had been an issue in the past, and there was no evidence in the record supporting Ms. Richard's concerns that such problems would develop. To the contrary, as Mr. Clarke argues, there was only speculation that A.C. leaving daycare and beginning pre-k 4 may create a timeliness problem. Consequently, in the present case, the trial court was asked to make a decision based only upon anticipated facts that could possibly have a negative impact on A.C. See **Hensgens v. Hensgens**, 94-1200 (La.App. 3 Cir. 3/15/95), 653 So.2d 48, 53, writ denied, 95-1488 (La. 9/22/95), 660 So.2d 478.

Further, when Ms. Richard was discussing what her plans would be when A.C. started school, she stated, "One of the schools does drop off and pick up from the daycare." Similarly, the trial court acknowledged in its oral reasons that no school had been identified, stating, "I didn't hear exactly which school[.]" These statements reflect that the issue of where A.C. would attend school had not been decided at the time of trial, making the likelihood that difficulties with transportation may develop even more suppositional. Thus, we find that Ms. Richard's claims before the trial court were purely

9

speculative, and the issue of a modification of child custody was not ripe for adjudication before the tribunal.[4] Accordingly, we find that the trial court improperly modified a custody decree without a showing of a material change of circumstances.

Because the first requirement for modifying the consent judgment was not satisfied, and the required change was not shown, the inquiry ends and there is no basis for altering the physical custody decree. **Fin**, 288 So.3d at 146. Thus, the trial court abused its discretion in modifying the physical custodial arrangement set forth in the July 14, 2021 and November 2, 2022 consent judgments. Accordingly, the May 24, 2023 judgment of the trial court is reversed insofar as it modified the parties' physical custodial schedule. See **Tinsley**, 211 So.3d at 418.

## CONCLUSION

For the foregoing reasons, that portion of the May 24, 2023 judgment of the trial court granting Ms. Richard's motion to modify custody is reversed. The physical custody schedule set forth in the July 14, 2021 and November 2, 2022 consent judgments is reinstated. In all other respects, the May 24, 2023 judgment is affirmed.

**REVERSED IN PART AND AFFIRMED IN PART.**

---

[4] We find this case to be distinguishable from **Shaffer**, 808 So.2d 354. In **Shaffer**, this court found that:

> The original custody decree providing that [the minor child] would spend the first week of every month with her father in Baton Rouge and the remaining three weeks with her mother in Lafayette is no longer, a practical schedule given the fact that [the minor child] has reached school age. . . Under the particular facts of this case, we agree that once [the minor child] reached school age, her need to attend one school in one location requires a modification of the original custody decree.

**Shaffer**, 808 So.2d at 357-58. However, in **Shaffer**, the child reaching school age rendered the existing custody schedule unworkable because the parties lived in Baton Rouge and Lafayette. In this matter, according to Ms. Richard, the parties live about thirty minutes apart, and both parties were able to successfully arrange for A.C. to be transported to and from daycare at the same location with no issues.